```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                  )
      United States of America,     )   File No. 23-CR-193
 4                                  )           (PJS/LIB)
               Plaintiff,           )
 5                                  )
      vs.                           )   Duluth, Minnesota
 6                                  )   January 29, 2024
      Terry Jon Martin,             )   10:04 a.m.
 7                                  )
               Defendant.           )
 8    ------------------------------------------------------------
 9


10
             BEFORE THE HONORABLE PATRICK J. SCHILTZ
11              UNITED STATES DISTRICT COURT JUDGE
                      (SENTENCING HEARING)
12


13
      APPEARANCES:
14    For the Plaintiff:          United States Attorney's Office
                                  MATTHEW D. GREENLEY, AUSA
15                                655 First Avenue North
                                  Suite 250
16                                Fargo, North Dakota 58102

17    For the Defendant:          Ringstrom DeKrey
                                  DANE DeKREY, ESQ.
18                                814 Center Avenue
                                  Suite 5
19                                Moorhead, Minnesota 56560

20    Court Reporter:            PAULA K. RICHTER, RMR-CRR-CRC
                                  300 South Fourth Street
21                                Minneapolis, Minnesota 55415

22


23


24        Proceedings reported by certified stenographer;
      transcript produced with computer.
25
```

1                         **P R O C E E D I N G S**

2                            **IN OPEN COURT**

3                 (Defendant present)

4             THE COURT:  We are here today for sentencing in

5       the case of United States of America versus Terry Jon

6       Martin.  The case is criminal case 23-0193.

7                 If I could have the attorneys make their

8       appearances, please.

9             MR. GREENLEY:  Matthew Greenley, Your Honor, from

10      the United States Attorney's Office in the District of North

11      Dakota.

12            THE COURT:  Good morning.

13            MR. GREENLEY:  And seated with me is Special Agent

14      Sean Dudley with the FBI.

15            THE COURT:  And good morning to you as well.

16            MR. DeKREY:  Good morning, Your Honor.  Dane

17      DeKrey with my client, Terry Jon Martin.

18            THE COURT:  And good morning, Mr. DeKrey.

19            Mr. Martin previously pled guilty to theft of a

20      major artwork.

21            Mr. Greenley, have you received a copy of the PSR

22      and the addendum?

23            MR. GREENLEY:  I have, Your Honor.

24            THE COURT:  And you have no objections; is that

25      correct?

1          MR. GREENLEY:  That's correct, Your Honor.

2          THE COURT:  And, Mr. DeKrey, have you and your

3     client received copies of the PSR and the addendum?

4          MR. DeKREY:  Yes, Your Honor.

5          THE COURT:  And have you read and discussed those

6     documents?

7          MR. DeKREY:  Yes, Your Honor.

8          THE COURT:  And you, likewise, have no objections;

9     is that correct?

10          MR. DeKREY:  Correct.

11          THE COURT:  All right.  I adopt as the findings of

12     this court all the factual statements contained in the PSR.

13          Mr. Greenley, did you want to move for the

14     additional one-level reduction for acceptance?

15          MR. GREENLEY:  Yes, Your Honor.

16          THE COURT:  All right.  I grant that motion, and I

17     determine the guidelines apply as follows:  The total

18     offense level is 21.  The criminal history category is VI,

19     with 15 points.  The imprisonment range recommended is

20     between 77 months and 96 months.  The supervised release

21     range recommended is between one year and three years.  The

22     fine range, $7,500 to $75,000.  And the special assessment,

23     $100.

24          Mr. Greenley, does that sound correct to you?

25          MR. GREENLEY:  It does.

1           THE COURT:  And, Mr. DeKrey?

2           MR. DeKREY:  Yes, Your Honor.

3           THE COURT:  All right.  In terms of departures,

4    both the government and the defense agree that I should

5    apply two downward departures.

6           To begin with, the parties agree that Mr. Martin

7    should receive a departure under Section 4A1.3 of the

8    sentencing guidelines because Mr. Martin's criminal history

9    category substantially overrepresents the seriousness of his

10   criminal history or the likelihood that he will commit other

11   crimes.  I agree with the parties.

12          First, Mr. Martin received nine criminal history

13   points for three cases that arose from his involvement in a

14   scheme for which he was arrested in 1986 merely because his

15   participation in the scheme resulted in three separate

16   criminal cases, one in federal court, one in Hennepin

17   County, and one in Ramsey County, and each sentence was

18   imposed on a different day.  Had all of these charges been

19   brought in a single case, Mr. Martin would have received

20   only three criminal history points.

21          And second, it is extremely unlikely that

22   Mr. Martin will commit another crime.  As far as the record

23   reflects, he has not committed a crime since he stole the

24   ruby slippers in 2005, now over 18 years ago.  He is also in

25   extremely poor health and will likely live only a few more

1    months.

2              For these reasons, I will depart downward and

3    treat Mr. Martin as though his criminal history category was

4    IV rather than VI.  That results in a guidelines range of 57

5    to 71 months.

6              The parties also ask me to depart downward under

7    Section 5H1.4 of the guidelines, which provides that an

8    extraordinary physical impairment may be a reason to depart

9    downward.

10             Mr. Martin has severe and terminal chronic

11   obstructive pulmonary disease, or COPD.  He takes over a

12   dozen medications.  He requires oxygen 24 hours per day.  He

13   is in home hospice care, and according to his doctors, he

14   will not live more than a few more months.  This undoubtedly

15   qualifies as an extraordinary physical impairment, and I

16   will depart downward to an extent that I will describe in a

17   few moments.

18             At this point, Mr. DeKrey, let me invite you to

19   the podium to say whatever you would like on Mr. Martin's

20   behalf.

21             They both work.  You can choose, or you can use

22   them both.

23             MR. DeKREY:  Sometimes microphones are picky

24   because they make a lot of noise.  I wanted to make sure I

25   wasn't in one of those courtrooms, Your Honor.

1          Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. DeKREY:  My name is Dane DeKrey.

4          THE COURT:  I remember.  Is the baby still on the

5     way?

6          MR. DeKREY:  The baby is here, Your Honor.  Baby

7     boy.  He's about two and a half months.  It was the 28th of

8     October.  We were here the 13th.

9          THE COURT:  Right.  It was the change of plea that

10    we needed to get in before.

11         MR. DeKREY:  Yes.  So he's healthy.  Thank you for

12    asking.

13         THE COURT:  Congratulations.

14         MR. DeKREY:  Thank you.

15         It's actually since that day we were here that

16    I've been thinking about what I want to say today.  And

17    after a large number of pieces of paper crumpled up, I began

18    to find a unifying theme, and I think that theme is closure.

19    And I think we all have an idea of what we think closure is,

20    but since Justice Kagan says that "We're all textualists

21    now," I want to read the definition of what I looked up this

22    morning to help frame my discussion.

23         The Oxford Dictionary has two definitions of

24    closure that I think are pertinent today.  First, closure is

25    a sense of resolution or conclusion at the end of an

1     artistic work.

2              Second, closure is a feeling that an emotional or

3     traumatic experience has been resolved.

4              Parsing out those two definitions, some words jump

5     out at me:  Resolution or conclusion.  I think they're

6     different for different people in this case.  And same with

7     an emotional or a traumatic experience.  Those are the North

8     Stars that I want to use as I make my sentencing argument

9     today.

10             There are three parties I see as having some sort

11    of closure today:

12             The government.  By that I mean the law

13    enforcement investigation of this case and the United States

14    Attorney's Office.

15             The victims.  By that I mean parties directly

16    affected by the theft of the ruby slippers.

17             And finally, my client, Terry Jon Martin.

18             Closure means something different to each of those

19    parties, and that's because, as these definitions show,

20    closure is subjective.  It's different for what closure

21    might be for the government, versus the victims, versus

22    Terry, and this case highlights the difference between the

23    closure that we want and the closure that the legal system

24    can provide.

25             So first let's talk about the government.  What

1    does perfect closure look like for the government?  I think

2    it looks like what they seek in every case.  Every

3    individual who's involved in criminal activity that they are

4    prosecuting is brought to justice and sentenced.

5          That perfect closure isn't possible here.  Some of

6    that, in candor, is because of my client.  But even if my

7    client was willing to tell the government everything that

8    they wanted to know, there would still be a lack of closure

9    for the government because, as our sentencing memo made

10    clear, there's a significant period of time where Terry

11    genuinely has no idea what was going on or what happened to

12    the ruby slippers.

13          But let's not let great be the enemy of the good.

14    What closure did the government get in this case?  They got

15    somebody to hold accountable for what happened in this case.

16    And by my count, this has been an eight-year, at a minimum,

17    endeavor, according to the discovery.  So getting someone is

18    better than getting no one.

19          They also got back the ruby slippers.  I think

20    that's a significant step towards closure.

21          And lastly, I think it sends a message to bad guys

22    both past, present, and future that the government doesn't

23    rest until they solve the crime.  You noted minutes ago, 18

24    years since this happened.  The government has been working

25    this case, or some sort of law enforcement agency, for 18

1    years.  They finally got at least one of the guys that did

2    it.  That's closure for the government.

3            Next let's talk about the victims.  What does

4    perfect closure look like for the victims of this case?  I

5    think it looks similar to what the government seeks, but the

6    difference is I think that the victims want to know the

7    entire story.  Even if that doesn't end up in the

8    prosecution of everybody involved, they want to know what

9    happened from the moment Terry punched a piece of glass and

10   took slippers to his cabin in the woods until the sting that

11   got the slippers back in Minneapolis.

12           But for the same reasons I just mentioned, that's

13   impossible to get from Terry.  Yes, there are some things

14   that he could give them that he hasn't, but there's a large

15   window of time between when Terry gave the slippers away

16   until they were recovered.  Even if he wanted to say what

17   happened, he couldn't because he has no knowledge of that

18   time period.

19           But I think their closure here -- and I don't want

20   to put words in their mouth, that's not fair -- but if I had

21   to compare it to the government's, I think they're more

22   satisfied and they've received more closure here.  And the

23   way I think about it is if you gave these victims the choice

24   of returning the ruby slippers in exchange for convicting

25   nobody or not returning them unless everybody was

1    convicted -- and I understand those are the poles -- they

2    would likely agree with number one.

3         This case is somewhere in the middle.  Probably

4    closer to returning the slippers and no one is convicted,

5    but someone is convicted.  So, again, Terry provided them

6    some closure.  He provided them an explanation of how it

7    happened.  He provided them an understanding that riveted a

8    community, caused law enforcement to run down leads for

9    years.  They at least know what happened that day, how it

10    was stolen, and what happened until he got rid of those

11    slippers.  And they have them back.

12         I think for the victims of this case, both direct

13    and indirect, the ruby red slippers are the most important

14    part.  Convicting people and sentencing them I think plays

15    second fiddle.  They will never be made fully whole in this

16    case.  We've agreed to restitution.  There will be victim

17    statements today.  But they're more whole now than they have

18    been in the last 18 years, and Terry deserves some credit

19    for that.

20         Finally, let's talk about Terry.  And before I do,

21    I'm sure that the Court has seen some of the media in this

22    case, and a lot of it is based on the fulsome sentencing

23    memorandum that I filed.

24         I want to make a specific point to say that it is

25    completely incorrect, to the extent anybody interprets it

1   this way, that Terry is a mobster, was a mobster, had ties

2   to the mob.  My legal writing teacher probably wants to help

3   me with my phrasing a little bit.  I said, "a mob

4   associate," and I should have said, "an associate who

5   himself had connections to the mob."  I can't go out and

6   tell the AP or all the news organizations to fix that story.

7   It's a fool's errand.

8          But I want you to know because it's important to

9   Terry and to me that in no way were we trying to

10  sensationalize this in any way.  That was not meant to be a

11  sensational sentencing memorandum.  I write fulsome

12  sentencing memorandums in every case I have.  I knew this

13  would probably take more fire than others have in your

14  run-of-the-mill North Dakota case, but I couldn't not do

15  that because it wouldn't have been fair to Terry to not show

16  who the person he is, to give you all of the 3553(a) factors

17  that you need to make this decision.

18         Terry is not a mobster.  Terry was not involved in

19  the mob.  Terry was a thief, a burglar, many of those things

20  that his PSR indicates, but never in that PSR is there any

21  connection or discussion of the mob.  That was a throwaway

22  line that was my mistake, and I apologize.

23         What does perfect cooperation -- what does perfect

24  closure look like for Terry?  Well, that's a bit of beauty

25  is in the eye of the beholder.  And for the Court, I imagine

1     it's a complete confession, complete cooperation, and trying

2     to do his best to bring everybody to justice that is

3     involved in this case.

4           That doesn't happen today, and that's Terry's

5     choice.  It would be easier for me.  It would be easier for

6     him in a sentencing, I would imagine, if that were the case

7     because we'd likely have a 5K motion available, and it would

8     make the Court's job easier.  But that's not required for

9     Terry to plead guilty.  Those aren't elements of his

10    offense.  He gets to make that choice.

11          I'm sure on the bench you have seen people who you

12    wish, by God, I wish you'd just confess or I wish you'd

13    cooperate so we could get more drugs off the street or get

14    these women to be done trafficked, all of those things.  But

15    if they don't, that doesn't mean they can't plead guilty and

16    they can't be sentenced under 3553(a).

17          But, again, great versus good.  We did get an

18    admission from Terry.  We did get an explanation from Terry

19    that all parties agree and the PSR is true.  And it's true,

20    he didn't confess out of the goodness of his heart.  He

21    could have come forward many years ago.  But he did confess

22    when they came to him.

23          Other people involved in this case, who may or may

24    not have been talked to by law enforcement, haven't.  He

25    deserves more credit than them.  He deserves some credit for

1   his decision, once his back was against the wall, to make
2   that choice.

3          He could have taken this to his grave.  We
4   mentioned that in the memorandum.  The Court mentioned his
5   health.  Terry could have persisted in a not guilty plea.
6   We could have done lots of pretrial litigation, tried to
7   push this case out, and Terry likely would be dead.  That
8   would have resulted in zero closure, zero of these answers.

9          He didn't do that, and his code is different than
10  mine, and his code is likely different than yours.  And I
11  mention that a lot in my memo, but I think that is part of
12  his code was to understand once I made this decision to tell
13  on myself, he was going to come forward and do it before he
14  died, for his own closure.

15         The other closure at play here is the reason why
16  we're asking for a time-served sentence, and that's the
17  closure of Terry's life.  Terry is dying, and fast.
18  Yesterday I had to leave from Moorhead, where I live, early
19  in the morning.  We have four children at home, a newborn,
20  two twins.  I had to arrange childcare with my
21  father-in-law, who drove me.  My mother-in-law is there.
22  Sundays are difficult.  If you have a lot of kids, you want
23  them in daycare by Monday morning.

24         We left early because we had to go to Grand
25  Rapids, or just south of Grand Rapids, to help Terry get

1    into his van, to get his oxygen tanks, to get that large

2    machine which is heavy, and I'm a little bit younger than

3    Terry so I can pick it up.  If he were forced to do that

4    with his wife, he likely -- I can't say if he would die, but

5    it would be very difficult for a man who can't breathe to do

6    those things.

7          Then we had to follow him here, get him in his

8    hotel room, carry his things up, make sure that he got his

9    oxygen back on, because his tanks only last a certain amount

10   of time.  And to go get tanks, they're not that close to

11   where they live in the rural part south of Grand Rapids.

12         I've never had to do this for another client.  I

13   don't say this for sympathy.  I don't say it for sympathy

14   for Terry.  I say it to give you the facts for you to

15   understand, which I think you do, is that another part of

16   the sensational story is that, first, if you believe he's a

17   mobster, which he's not, what do mobsters do at the end of

18   Scorsese movies?  They roll in in wheelchairs.  They have

19   oxygen on their nose.  Then when they get out, they take it

20   off and they talk about their plans.  We see that currently

21   with Harvey Weinstein, with the lawyer in California who

22   just was found competent.  His name, Mr. Girardi.  These

23   things happen.  We don't want this Court to think that in

24   any way we are trying to game the system by overplaying

25   Terry's sick hand.

1          He is extremely sick.  His cocktail regimen of

2    drugs I've never seen before.  They are -- in the afternoon,

3    Terry struggles with reality sometimes because he's so

4    heavily medicated.  I can't get hospice to agree that he's

5    on hospice.  Those are objective facts that show that Terry

6    Martin is very close to death's door.

7          Very soon he's likely to have another sentencing

8    hearing, whether he believes in God or what his religion is.

9    He'll have to make peace with his maker or whatever he

10   believes in when he dies, for his past transgressions, good

11   and bad.

12         We believe, and the joint recommendation with the

13   government, that it's best for him to have that opportunity

14   from home, cared by his wife, who is here, dying quietly

15   without having to force the Bureau of Prisons to get

16   involved to make the last days of his life more difficult

17   than they likely already are.

18         Terry Martin should never have stolen the ruby

19   slippers.  He was on a great path in his life.  It seemed

20   like he had turned the corner.  I wished -- I know Terry,

21   and when I talk about him, you know, there's a Bryan Stevens

22   line -- Stevenson -- that you're greater than the worst

23   thing you ever did, and that's easy to say all the time.

24   But I believe it.  And if I don't believe it, I shouldn't be

25   in this job and in this business.

 1           And I learned from great people, Andrew Mohring,

 2      Katherian Roe.  These were my mentors when I was in law

 3      school.  You learn to love your clients, and it's important

 4      for Terry to hear that and for people to hear it because

 5      he's become a caricature a bit.  He made the choice.  He

 6      deserves some of it for what he did, but he is so much more

 7      than simply an old thief who had one last score in Grand

 8      Rapids.  And but for that blip, from 1996 until today, he's

 9      lived a quiet, honorable life.  We ask that you allow him to

10      finish that life at home with a time-served sentence.

11           THE COURT:  Thank you, Mr. DeKrey.

12           MR. DeKREY:  Thank you.

13           THE COURT:  Mr. Martin, did you want to say

14      anything this morning on your own behalf?

15           THE DEFENDANT:  No, Your Honor.

16           THE COURT:  All right.  Thank you.

17           Mr. Greenley.

18           MR. GREENLEY:  Thank you, Your Honor.

19           THE COURT:  Are there victims that want to make

20      statements in this case?

21           MR. GREENLEY:  Yes.

22           THE COURT:  Okay.  You can speak first or you can

23      have them speak first, however you want to do it.

24           MR. GREENLEY:  I'll speak first and then call on

25      Janie Heitz, H-E-I-T-Z, and John Kelsch, K-E-L-S-C-H.

1          Your Honor, cases like this call to mind the

2    glamorous movies like *The Thomas Crown Affair*, but I've

3    learned through Special Agent Dudley with the FBI, he's a

4    member of the FBI Art Crimes Team, that these cases are

5    neither glamorous like those movies, and you don't see the

6    impact on the real people.

7          John Kelsch and the Judy Garland Museum have

8    submitted victim impact statements in this case.  They're

9    far more eloquent than I, and they'll have a chance to speak

10   about some of the impact it has had on them.  And you've

11   also read the victim impact statement from Michael Shaw.

12   Their worlds were upturned by this crime, and it was a

13   long-lasting crime.  Mr. Martin seemed to have committed it

14   with no regard for what would happen to them and really no

15   appreciation of the true value of the ruby slippers, the

16   fact that they have cultural heritage and not value because

17   there was a gemstone on the slippers.

18          In this case, the slippers had disappeared until

19   July 2018, when the FBI recovered them with the help of

20   Markel Insurance.  My understanding is that's when

21   Mr. Martin's health started to decline seriously.  And the

22   United States is very sympathetic to Mr. Martin's declining

23   health, but we see this late-in-life prosecution as a

24   foreseeable consequence of stealing an artifact like the

25   ruby slippers that cannot be readily fenced, attempting to

1    extort a reward long after the theft and, in essence,

2    Mr. Martin chose his associates who, in turn, chose the

3    timeline for this prosecution.

4          I want to address one line in the defense

5    position, and that is that there's a statement that at times

6    the investigation was unethical.  And there's no factual or

7    legal explanation in the defense position, but both the

8    U.S. Attorney's Office and the FBI strongly object to the

9    characterization of this investigation and prosecution as

10   unethical, especially in the sense of it violating any type

11   of professional standard.  We don't believe that this

12   investigation or prosecution violated the law, the

13   Constitution, DOJ policy, the Rules of Professional Conduct,

14   or government ethics.

15         If there was a basis to state that the

16   investigation was unethical, I'm sure Mr. DeKrey would have

17   laid it out in some detail and would have addressed it prior

18   to sentencing.

19         So I reached out to Mr. DeKrey to find out why he

20   included that in his position, and I think it had to do with

21   how Mr. Martin's admissions were obtained in this case, so

22   I'd like to briefly address that.  And I think that

23   statement was used more in the layman's way of unethical,

24   and I think what it means is that Mr. Martin was upset with

25   how his admissions were obtained.

1       After the attempted extortion in this case, the

2   FBI looked at all of the call records of the people that

3   they believed were involved in the extortion.  Mr. Martin

4   had extensive phone contact with one of the subjects of the

5   investigation.  That, coupled with the fact that he lived in

6   Grand Rapids and had lived there for a long time, and he had

7   a criminal history that involved many burglaries and thefts,

8   he became a subject.

9       In investigating Mr. Martin, it was discovered

10  that his wife, Ms. Abraham, was in the United States

11  illegally.  She had been removed at one point, I think

12  approximately 30 years ago, and she returned without

13  permission.  And that fact involved United States

14  Citizens -- Immigration and Customs Enforcement, Your Honor.

15  They opened a file on Ms. Abraham.  That permitted the

16  United States to execute a search warrant at Mr. Martin's

17  residence.  I understand that he's upset that that was the

18  basis that they were there at his house.

19      The FBI had no control over any subsequent

20  administrative process except that it did offer if

21  Mr. Martin made some admissions and agreed to be

22  interviewed, the United States agreed not to prosecute him

23  for harboring an alien, they agreed not to prosecute

24  Ms. Abraham, and they agreed to make the affirmative step of

25  asking Citizenship and Immigration to place Ms. Abraham into

1    a deferred status.

2         My understanding is that she continues to be in

3    that deferred status today, so no action will be taken on

4    her citizenship.  We do believe that this was a more carrot

5    than stick approach to obtain Mr. Martin's admissions.  In

6    addition to this, the FBI is making efforts to get

7    Ms. Abraham into a more permanent, lawful status in the

8    United States, and they continue to work that angle.

9         In sum, I think Mr. Martin is upset.  I don't

10   believe that anything that we did was unethical or unusual.

11   That's how many admissions and statements are obtained in

12   federal investigations, and this was no different.  We don't

13   believe that there's anything that should open an internal

14   investigation in this case, in other words.

15        To briefly address restitution, Your Honor, the

16   parties have come to an agreement that was outlined in the

17   supplemental filing in the United States.  The NVRA doesn't

18   seem to provide a complete remedy for all of the victims in

19   the case, as we set forth.  Because the parties are

20   stipulating to this amount, at this point had the United

21   States had greater foresight, we likely would have included

22   restitution in the plea agreement.  The NVRA does allow the

23   parties to agree and stipulate to restitution, even if the

24   NVRA doesn't provide for it.  And so alternatively to the

25   tortured interpretation that I set forth, that might be

1    another ground to permit the award of restitution to the

2    Judy Garland Museum in this case.

3            At this time I would invite Mr. John Kelsch, who

4    was the director of the Judy Garland Children's Museum at

5    the time of the theft, to speak, along with Janie Heitz, who

6    is the current director of the Children's Museum.

7            THE COURT:  All right.  I'd be happy to hear from

8    them.

9            Good morning to both of you.

10           MS. HEITZ:  Good morning.

11           MR. KELSCH:  Good morning, Your Honor.

12           MS. HEITZ:  Thank you for having us.

13           THE COURT:  Sure.

14           MR. KELSCH:  This was a crime against one of the

15   world's most treasured works of art, *The Wizard of Oz.*

16   Michael Shaw was the greatest victim.  And tens of thousands

17   of people all over the United States missed the opportunity

18   to see these slippers for 18 years.  They would have

19   traveled all over the country.

20           The museum had many lost opportunities.  We could

21   no longer borrow world-class pieces after this reputation.

22   Economically, five years after the crime, our museum had to

23   sell assets, partly as a result of this.  Donations dropped.

24   Admissions dropped.  So we sold a quarter million dollars'

25   worth of assets, land and other collections, that we regret.

1            But we do have some closure in Grand Rapids.  It's

2   no longer considered an inside job.

3            MS. HEITZ:  You know, we looked back at the

4   numbers in the years that Mr. Shaw had brought the slippers,

5   and there was a significant increase in admissions and

6   memberships.  And then we followed it for about seven years

7   after, and like John said, I mean, the museum lost a

8   significant amount of credibility.

9            Mr. Shaw was one of many collectors that John had

10   already built a relationship with at the time, and it's hard

11   to quantify what could have been.  You know, in 1989, the

12   first time he brought him here, we had 30,000 people that

13   came to the small town of Grand Rapids to celebrate the ruby

14   slippers and *The Wizard of Oz* and Judy Garland.

15            So it's those types of relationships that John

16   built that were gone after the slippers were stolen from our

17   museum.  It affected our financials pretty significantly.

18   And I would say John personally was, you know, a suspect for

19   the crime and a pretty difficult time for him to be -- when

20   he was innocent.  And yeah, I just think our credibility as

21   a museum was gone, and it's very hard to get that back.

22            MR. KELSCH:  Thank you, Your Honor.

23            MS. HEITZ:  Thank you.

24            THE COURT:  Thank you.

25            Mr. Greenley, did you have anything more?

1          MR. GREENLEY:  No, Your Honor.

2          THE COURT:  Okay.  I will move to sentencing then,

3     and you can remain seated at the defense table.

4          I have carefully reviewed the presentence

5     investigation report and the addendum to the report.  I now

6     accept the plea agreement, and I'm prepared to impose the

7     sentence.

8          It is the judgment of the Court that you, Terry

9     Jon Martin, are sentenced to time served.

10          No fine is imposed.

11          You must pay restitution in the amount of $23,500

12     to the Judy Garland Museum in Grand Rapids, Minnesota.  This

13     amount is due and payable immediately.  The interest

14     requirement is waived.

15          You must make monthly payments of $300 towards

16     your restitution obligation, beginning with a payment for

17     January 2024.  If the probation officer determines that you

18     are able to pay more than $300 per month, the probation

19     officer must notify the Court so that the Court may

20     determine whether to modify this restitution order.

21          Your payments should be made to the Clerk of the

22     United States District Court for the District of Minnesota,

23     who will forward your payments to the museum.

24          You must pay a special assessment in the amount of

25     $100 to the United States, due immediately.

1        You must serve a term of supervised release of one

2    year, beginning immediately.

3        While on supervised release, you must comply with

4    the following conditions:

5        First, you must comply with the mandatory and

6    standard conditions of supervised release described in

7    Section 5D1.3 of the version of the United States Sentencing

8    Guidelines that took effect on November 1st, 2023, except

9    that mandatory drug testing is waived.

10        Second, you must give the probation officer access

11    to any requested financial information, including credit

12    reports, credit card bills, bank statements, investment

13    account statements, property records, telephone bills, and

14    utility bills.

15        And, finally, third, you must promptly notify the

16    probation officer of any material change in your financial

17    circumstances that might affect your ability to pay

18    restitution.

19        I direct that the probation office furnish to you

20    a written statement of all of the conditions of your

21    supervised release.

22        In terms of the reasons for the sentence, I have

23    accepted the joint recommendation of the prosecution and the

24    defense and sentenced Mr. Martin to time served.  In doing

25    so, I certainly do not mean to minimize the seriousness of

1    Mr. Martin's crime.  Mr. Martin intended to steal and then

2    to destroy an irreplaceable part of America's cultural

3    heritage, merely to line his pockets.  His theft of the ruby

4    slippers was extraordinary:  Extraordinary in its stupidity,

5    extraordinary in its selfishness, and extraordinary in its

6    impact.

7         The theft had a devastating impact on the Judy

8    Garland Museum and the people of Grand Rapids, on the owner

9    of the slippers, and on the millions of people who felt an

10   emotional attachment to the slippers or to Judy Garland or

11   to *The Wizard of Oz* or just to the era they represent.

12        The selfishness and lack of respect for others

13   that Mr. Martin displayed were unfortunately not out of

14   character for him.  This is Mr. Martin's 14th felony

15   conviction.  His prior convictions include four convictions

16   for burglary, three convictions for receiving stolen

17   property, three convictions for drug offenses, and

18   convictions for robbery, aggravated assault, and being a

19   felon in possession of a firearm.  If this were 2005, I

20   would likely sentence Mr. Martin to ten years in prison,

21   which is the statutory maximum, but this is not 2005 and a

22   lot has changed in the intervening 18-plus years.

23        First, as far as we know, Mr. Martin has not

24   committed a crime since 2005.  Indeed, as far as we know,

25   Mr. Martin has not committed a crime since 1986, except for

1    the crime for which he's being sentenced today and a couple

2    of DWIs.

3           And second, and much more importantly, Mr. Martin

4    suffers from a terminal illness.  He is in hospice care, and

5    he is unlikely to live more than a few more months.

6           Given that Mr. Martin is gravely ill and will not

7    recover and given that Mr. Martin has lived a law-abiding

8    life for the past 18 years, I accept the recommendation of

9    the parties that Mr. Martin be sentenced to time served.

10          I have, however, imposed a one-year term of

11    supervised release, along with conditions to ensure that

12    during the time he has left, Mr. Martin starts making

13    restitution payments.

14          All right.  Mr. Martin, you have the right to

15    appeal your conviction if you believe that your guilty plea

16    was unlawful or invalid for any reason.  In general, a

17    defendant also has the right to appeal his sentence, but you

18    entered into a plea agreement with the government, and in

19    that plea agreement, you gave up your right to appeal a

20    sentence of the length that I've just imposed.  Courts will

21    usually enforce those waivers, but if you believe that,

22    notwithstanding your plea agreement, you still have the

23    right to appeal your sentence, you can go ahead and appeal

24    your sentence and make your argument to the Court of

25    Appeals.

1          If you do want to appeal your conviction or your

2     sentence or both, you have to file a notice of appeal, and

3     you have to do so within 14 days after I enter the judgment

4     in your case, which will likely be tomorrow.

5          You can ask your attorney to file a notice of

6     appeal for you, or you can ask the clerk of court to file a

7     notice of appeal on your behalf.

8          If you cannot afford to pay the cost of an appeal,

9     you can ask for permission to be excused from paying those

10    costs.

11         The presentence investigation report will be kept

12    in the Court's files under seal.  If an appeal is filed,

13    that report will be delivered to the Court of Appeals.

14         And you should talk to the probation office about

15    the details of serving your term of supervised release.

16         All right.  Mr. DeKrey, did you have anything more

17    today?

18         MR. DeKREY:  Nothing, Your Honor.

19         THE COURT:  Mr. Greenley, anything more?

20         MR. GREENLEY:  No, Your Honor.

21         THE COURT:  All right.  Thank you.

22         (Court adjourned at 10:41 a.m.)

23              *     *     *

24

25

1        I, Paula K. Richter, certify that the foregoing is

2    a correct transcript from the record of proceedings in the

3    above-entitled matter.

4

5                    Certified by:  *s/ Paula K. Richter*

6                                    Paula K. Richter, RMR-CRR-CRC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25